NORTH CAROLINA FISHERIES AS-
SOCIATION, INC. and Georges
Seafood, Inc., Plaintiffs,

State of North Carolina, ex rel. James B.
Hunt, Jr., Governor, and North Carolina
Department of Environment, Health and
Natural Resources, Plaintiffs–Interve-
nors,

v.

William M. DALEY, Secretary
of Commerce, Defendant.

Civil Action No. 2:97CV339.

United States District Court,
E.D. Virginia,
Norfolk Division.

Oct. 10, 1997.

Waverley Lee Berkley, III, Mark Steven Davis, McGuire, Woods, Battle & Boothe, Norfolk, VA, for North Carolina Fisheries Association, Inc., and Georges Seafood, Inc., Plaintiffs.

Michael Vincent Hernandez, Professor, Regent University School of Law, Virginia Beach, VA, Amy R. Gillespie, North Carolina Department of Justice, Raleigh, VA, Daniel F. McLawhorn, North Carolina Dept. of Environment & Natural Resources, Raleigh, NC, for the State of North Carolina, and North Carolina Department of Environment and Natural Resources, Intervenor–Plaintiffs.

George M. Kelley, III, U.S. Attorney's Office, Norfolk, VA, Lois J. Schiffer, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, DC, Eileen Sobeck, Office of the Attorney General, Environment & Natural Resources Div., Wildlife & Marine Resources Section, Washington, DC, Warigia Bowman, Wildlife and Marine Resources Section, U.S. Dept. of Justice, Washington, DC, for William M. Daley, Defendant.

Richard Ernest John Slaney, Wolcott, Rivers, Wheary, Basnight & Kelly, P.C., Virginia Beach, VA, for Natural Resources Defense Council, Movant.

## ORDER & OPINION

DOUMAR, District Judge.

In its simplest terms, this case is an effort by the fisherman of North Carolina to in-

crease the amount of summer flounder that they are authorized to land for the year 1997. Much of the problem centers on an overfishing of some 592,748 pounds of fish which they allegedly caught in excess of their quota in the year 1995. In addition, Plaintiffs and Intervenor–Plaintiffs raise problems with the National Marine Fisheries Service's computing of the catch, its timing in making determinations, and its consideration of the economic effects on the fisherman. The age old problem of the regulator versus the regulated and the differing interpretations each places on certain factors is involved.

Using a combination of inputs, the Defendant Secretary fixes a quota for fisherman to land summer flounder. This quota applies to both recreational and commercial fisherman. Here, we are concerned with the commercial fisherman and their quota. The ceremonial courtroom was jam-packed with fisherman on the day of the hearing. Mostly these fisherman are from small communities in Eastern North Carolina bordering the sounds and barrier beaches.

This case is before the court on Plaintiffs', Intervenor–Plaintiffs' and Defendant's cross-motions for summary judgment. In summary, the Court finds for the Plaintiffs and Intervenor–Plaintiffs on Counts One, Six and Nine. The Court REMANDS the 1997 quota to the Secretary of Commerce and ORDERS the Secretary to conduct a level of economic analysis consistent with his obligations under the Regulatory Flexibility Act and National Standard 8 of the Magnuson–Stevens Act as discussed below. As to Count Nine, the Court ORDERS the Secretary to publish each year's adjusted quota within a reasonable period of time to enable fisherman to utilize the quota appropriately. The Court DISMISSES Counts Three and Five WITH PREJUDICE; and the Court GRANTS Defendant's motion for summary judgment on Counts Two, Four, Seven, Eight and Ten.

## I.  Background

The summer flounder fisheries on the East Coast are subject to a detailed management scheme which is designed to reduce the mortality rate of summer flounder. The fishery management plan (FMP) for summer flounder was initially adopted by the National Marine Fisheries Service in 1988. Several amendments to that plan have been made since that time. Part of this management scheme includes the establishment of a coastwide quota for summer flounder which is apportioned between the various states on the East Coast.

The quota is established by the National Marine Fisheries Services (NMFS) after considering the recommendations of the Summer Flounder Monitoring Committee.[1] In determining the quota, a stock assessment is calculated which is an assessment of the number of summer flounder in the entire fishery. This is established by considering many factors including the prior year's catch based on landings reported. In determining this figure, it is generally accepted that the landings will be under-reported by approximately 30%.[2] Therefore, the stock assessment for 1997 included a reduction of the final population estimate by the amount reported overfished in 1995 plus approximately 30% for under-reporting. In determining the 1997 quota and assessment, the figures for 1995 are highly determinative because the 1996 figures are not yet available when the agency begins its calculations. *See infra* note 14.

The quota is allocated between commercial and recreational fisheries. North Carolina is allocated slightly less than 27.5% of the coastwide commercial quota. 50 C.F.R. § 648.100(d)(1). NMFS is required by federal regulation to announce the proposed commercial quota for each year on October 15 of the previous year. 50 C.F.R. § 648.100(c). Furthermore, if a state overfishes in any

---

**1.** The Summer Flounder Monitoring Committee consists of representatives from the Atlantic States Marine Fisheries Commission, the New England Fisheries Management Council, the Mid–Atlantic Fishery Management Council, and the National Marine Fisheries Service.

**2.** The Court bases this figure on how the 1997 quota was determined. *See* Minutes of the Mid–Atlantic Fishery Management Council Meeting, September 17–19, 1997, at 6, 9, 58, A.R. at 307, 310, 359. The figure for under-reporting varies from 20% to 50%. *Id.* Thus, 30% is an approximation.

given year, the overages from that year must be deducted from that state's annual quota for the following year. 50 C.F.R. § 648.100(d)(2).

Dealers—persons or firms that receive summer flounder for a commercial purpose—submit weekly reports to NMFS stating the number of fish purchased and the name and permit number of the vessels from which the fish were purchased. Owners and operators also submit fishing vessel trip reports. In addition to collecting weekly summaries from dealers, NMFS also collects dealer purchase reports to verify the information contained on the weekly summaries. In 1995 and 1996, NMFS did not collect dealer purchase reports from dealers in North Carolina while it did collect these reports from dealers in other states.[3]

North Carolina's proposed quota for 1996 was published on November 28, 1995. The final quota was published on January 4, 1996. *See infra* Figure 1. North Carolina's 1996 quota was 3,049, 589 pounds of summer flounder. On December 10, 1996 close to the end of North Carolina's fishing season, the federal government adjusted North Carolina's 1996 quota downward by 592,748 pounds due to an overage from the 1995 season.[4]

On December 18, 1996, the federal government announced the proposed quota for 1997, over two months after it was required to do so. 50 C.F.R. § 648.100(c). Relying on this proposed quota and its meetings with the federal government, North Carolina closed its fishery on January 10, 1997, only ten days after the season opened, in order to reserve 30% of its quota for its fall fishery.

The final quota for 1997 was published on March 7, 1997. North Carolina's quota was again established at 3,049, 589 lbs. Then, as required by federal regulation, the federal government reduced North Carolina's quota by 1,237,149 which was North Carolina's overage for 1996. *See infra* discussion of Count Seven. North Carolina's 1997 quota was again adjusted downward on July 7, 1997 due to 538,835 pounds of additional overages discovered for 1996. Therefore, North Carolina's current adjusted quota for 1997 is 1,273,605.

**Figure 1.** This table outlines the actions taken in regard to the North Carolina summer flounder quota in 1996 and 1997.

| Date | Action | Pounds of Flounder | Source |
|------|--------|-------------------|--------|
| 1/4/96 | 1996 NC quota set | 3,049,859 lbs. | A.R. at 139 |
| 3/13/96 | NC transfers fish to Virginia | (5,773) lbs. | 61 Fed.Reg. 10286 |
| | Adjusted 1996 NC quota | 3,043,816 lbs. | 61 Fed.Reg. 10286 |
| 4/5/96 | States 1996 quotas adjusted for 1995 overage; no adjustment for North Carolina | | A.R. at 169 |
| 12/10/96 | NC quota adjusted for 1995 overage | (592,748) lbs. | A.R. at 645 |
| | Adjusted 1996 NC quota | 2,451,068 lbs. | A.R. at 645 |
| 12/18/96 | 1997 quota proposed | 3,049,589 lbs. | A.R. at 658 |
| 4/7/97 | 1997 NC quota set | 3,049,589 lbs. | A.R. at 744 |

**3.** The federal government notes in its response that, because North Carolina maintained a trip-ticket system and collected records of all landings of summer flounder in the state, NMFS approached North Carolina in March 1996 to negotiate an agreement whereby data could be shared thus decreasing the burden on dealers in North Carolina. Federal Defendant's Response at 13–14. (The federal government does not explain why it did not collect these reports in 1995.) The negotiations were suspended in December 1996 when North Carolina informed NMFS that the information was confidential under North Carolina law and could not be shared. *Id.* at 14. A negotiation is not an agreement, therefore, NMFS was not relieved of its responsibility to obtain information in a timely fashion until an agreement was reached.

**4.** North Carolina had previously had its 1996 quota reduced by 5,773 pounds which it voluntarily transferred to Virginia. 61 Fed.Reg. 10286 (1996).

| | | | |
|---|---|---|---|
| | NC quota adjusted for 1996 overage * | (1,237, 149) lbs. | A.R. at 744 |
| | Adjusted 1997 NC quota | 1,812,440 lbs. | A.R. at 744 |
| 7/15/97 | NC quota adjusted for additional overage discovered for 1996 | (538, 835) lbs. | 62 Fed.Reg. 37741 |
| | Adjusted 1997 NC quota | 1, 273, 605 lbs. | 62 Fed.Reg. 37741 |

* 1996 overage is calculated by subtracting the adjusted 1996 quota from the 1996 landings:

| | |
|---|---|
| 1996 landings | 3,688,217 |
| Adjusted 1996 quota | (2,451,068) |
| 1996 overage | (1,237,149) |

Plaintiffs, North Carolina Fisheries Association and Georges Seafood, Inc., filed a ten count complaint with this Court on April 4, 1997 alleging that the federal government violated the Regulatory Flexibility Act, the Magnuson–Stevens Act, the Administrative Procedure Act and various federal regulations in setting and adjusting the 1997 quota and in adjusting the 1996 quota. Defendant filed an answer on May 28, 1997. Intervenor–Plaintiffs, the State of North Carolina and the North Carolina Department of Environment, Health and Natural Resources, filed a complaint very similar to the Plaintiffs' complaint on August 26, 1997.[5]

All parties filed motions for summary judgment, and the court heard arguments on September 22, 1997. At that time, the Court determined that it was necessary to have an evidentiary hearing on September 29, 1997 to determine whether there was a sufficient economic impact such that the Secretary of Commerce needed to do more fact finding than was evident from the administrative record before determining that there was no significant impact on small businesses. More than 100 men and women who make their living fishing in the various coastal communities in North Carolina came to court willing to testify to the substantial effect that the quota had on their businesses.

## II. Analysis

### Standard of Review

Both the Regulatory Flexibility Act, 5 U.S.C. § 611, and the Magnuson–Stevens Act, 16 U.S.C. § 1855(f), provide for judicial review of agency actions. Agency actions under both statutes are to be reviewed for compliance in accordance with Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* Regulatory Flexibility Act, 5 U.S.C. § 611(a)(2); Magnuson–Stevens Act, 16 U.S.C. § 1855, 16 U.S.C. § 1855(f)(1).

The Administrative Procedure Act (APA) states that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ...." 5 U.S.C. § 706(2)(A). Therefore, this Court will review the Secretary's actions in accordance with these standards. *See Fishermen's Dock Cooperative, Inc. v. Brown,* 75 F.3d 164, 167–68 (4th Cir.1996).

### Count One

Plaintiffs allege in Count One of their complaint that NMFS's failure to conduct an initial regulatory flexibility analysis and final regulatory flexibility analysis when setting the 1997 quota violated §§ 603 & 604 of the Regulatory Flexibility Act and thus violated the Administrative Procedure Act.

■■■ Defendant argues that he complied with § 605(b) of the Regulatory Flexibility Act by certifying that there would be no significant economic impact on small entities.[6] The Defendant did make a certification when he published the proposed rule: "The proposed measures would not have a

---

**5.** Throughout the rest of this opinion, Plaintiffs and Intervenor–Plaintiffs will be referred to collectively as "Plaintiffs" as these parties adopted each others motions, memorandums in support and responses and divided the issues between them for oral argument.

**6.** Section 605(b) of the Regulatory Flexibility Act states:

Sections 603 and 604 of this title [requiring initial and final regulatory flexibility analyses] shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities.

significant economic impact on a substantial number of small entities." 61 Fed.Reg. 66648 (1996), A.R. at 658. The Secretary also provided the "factual basis" for the certification: "The recommended 1997 quota is no different from the 1996 coastwide harvest limit of 18.51 million lb." *Id.* While this is a "statement," it does not provide a factual basis. There is no explanation why the fact that the quotas are the same means there will be no impact.[7] While the federal government cannot be expected to explore every possible contingency before certifying that there is no significant impact, the government must make some showing that it has at least considered the potential effects of *this* quota, *this* year.[8] There is no evidence in the Administrative Record that any such consideration was undertaken.[9]

The federal government did consider three possible quotas for the 1997 fishery, but the

---

If the head of the agency makes a certification under the preceding sentence, the agency shall publish such certification in the Federal Register at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule, along with a statement providing the factual basis for such certification.

7. Ever since Keynes proposed his theories of tax and spending, the government has undertaken to regulate all types of activity while supposedly considering economic effects. The court notes that the Secretary's reasoning provides an interesting new economic theory—regulations which merely adopt the past have no economic effect on the future. The Secretary must believe the economy never changes. This theory must have Keynes in perpetual motion, and the court cautions anyone from treading too close to his grave lest that person be drawn into the ground by the funnel effect created.

8. Ironically, one of the very changes in condition that led to what appears to the court to be a significant impact is the central issue of this lawsuit—the fact that North Carolina is being forced to pay back 1995 overages, calculations of which were not finalized until December of 1996, when it was far too late to manage the fishery to avoid this outcome. While the overages do have to be subtracted under the existing law, the effect of NMFS's timing in adjusting the 1996 quota was devastating on North Carolina fisherman.

The federal government knew when it made its proposal that the fisherman would be landing substantially less fish because of 1995 and 1996 overages: "I propose holding the harvest level at the level recommended by the Council, however. These measures, and the deduction of 1995 and 1996 overages, will reduce the actual 1997 landings substantially, more in line with the FMP objectives." Memo from Dr. Andrew Rosenberg, Regional Administrator to Rolland Schmitten, Assistant Administrator for Fisheries A.R. at 629. "Many states have exceeded their 1996 quotas and the 1997 quota will be decreased at least 14% as a result . . . ." *Id.*, A.R. at 631.

The government also noted, directly after stating that there would be no significant economic impact because the quota had remained the same from 1996 to 1997, that "[t]hese measures may impact the fishing industry negatively for the short term, but will prove beneficial in the future." 61 Fed.Reg. 66648 (1996).

9. NMFS's own guidelines outline the criteria to be used in making this determination:

After reviewing the criteria for significant economic impact on a substantial number of small entities . . ., the Council and the Regional Director may initially conclude that a regulatory flexibility analysis is unnecessary. Section 605(b) of the RFA allows certification at the time of the proposed or final rule that it will not, if promulgated, have a significant economic impact on a substantial number of small entities. An explanation of the certification of non-significance should be contained in the proposed rule. The certification is a legally conclusive determination that the regulatory flexibility analysis is unnecessary. . . .

A certification should contain the following elements as appropriate made by the "agency head" or one to whom the "agency head" has formally delegated authority for the RFA

I. A statement that the regulation, if promulgated, will not have a significant economic impact on a substantial number of small entities.

ii. A "succinct statement" explaining how the conclusion in 1 above was reached. The statement should include the following elements.

— It should make clear the reasoning for the determination, especially for important regulations.

— It should include the criteria used to determine that the rule will not have a "significant impact" on small entities.

NMFS's *Guidelines on Regulatory Analysis of Fishery Management Actions ("Guidelines")* at 14, Administrative Record ("A.R.") at 61–62.

NMFS's *Guidelines* define a substantial number of small entities as follows:

In general, a "substantial number" of small entities is more than 20 percent of those entities . . . . This percentage is calculated on the number of small entities affected by the regulations out of the total universe of small entities in a particular industry or segment of that industry. If the effects of the rule fall primarily on a distinct segment, or portion thereof, of the industry (user group, gear type, geographical area, etc.), that segment would be consid-

government failed to do any significant analysis to support its conclusion that there would be no significant impact. The only justification provided by the government was that the quota remained the same from 1996 to 1997. There is no record whatsoever showing that the federal government did any comparison between conditions in 1996 and 1997. A simple conclusory statement that, because the quota was the same in 1997 as it was in 1996, there would be no significant impact, is not an analysis. It is evident to this Court from the some 100 North Carolina fisherman who appeared to testify that their businesses were significantly affected that there was a significant economic impact, and there must have been some change in conditions between the two years to cause such an impact.

■ The United States Supreme Court has held that an action may be considered arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). It is clear to this Court that the Secretary acted arbitrarily and capriciously in failing to give any significant consideration to the economic impact of the quota on the North Carolina fishery.

The Court will not substitute its findings for those of the Secretary of Commerce nor will the Court change the quota.[10] Instead, the Court finds that the Secretary of Commerce violated the Regulatory Flexibility Act and REMANDS this quota to the Secretary and ORDERS him to undertake enough analysis to determine whether the quota had a significant economic impact on the North Carolina fishery. The Court further ORDERS the Secretary to include in his analysis whether the *adjusted* quota will have a significant economic impact on small entities in North Carolina. The Court ORDERS the Secretary to report the results to this Court by December 1, 1997. If the Secretary finds, after giving the matter a sufficient level of consideration and reducing that consideration to writing, that there is no significant economic effect on a substantial number of small entities, then so be it; but this Court will not stand by and allow the Secretary to attempt to achieve a desirable end by using illegal means.

**Count Six**

The Court addresses Count Six at this point in its opinion because Plaintiffs argued

---

ered the universe for the purposes of this criterion. The 20 percent criterion represents a general guide because there may be instances when the intent of the RFA would imply the need for a regulatory flexibility analysis even though less than 20 percent of the small entities in the industry are affected.
*Guidelines* at 13, A.R. at 60. It should be noted that North Carolina is allotted just under 27.5% of the quota suggesting that North Carolina fisherman constitute at least 20% of the small entities affected by the quota. Furthermore, because of the timing of the final 1996 quota adjustment for North Carolina, the effect of the 1997 quota fell heavily on one geographic segment of the industry, North Carolina. Therefore, under NMFS's *Guidelines*, North Carolina could be considered a "universe" for the purposes of this guideline.
NMFS outlines five criteria which, if met, would mean that there would be a significant economic impact on small entities:

1. The regulations are likely to result in a reduction in annual gross revenues by more than 5 percent.
2. Annual compliance costs (annualized capital, operating, reporting, etc.) increase total costs of production for small entities by more that [sic] 5 percent.

3. Compliance costs as a percent of sales for small entities are at least 10 percent higher than compliance costs as a percent of sales for large entities.
4. Capital costs of compliance represent a significant portion of capital available to small entities, considering internal cash flow and external financing capabilities.
5. The requirements of the regulation are likely to result in a number of the small entities affected being forced to cease business operations. This number is not precisely defined by SBA, but a "rule of thumb" to trigger this criterion would be 2 percent of the small entities affected.

*Guidelines* at 14, A.R. at 61. Clearly, both criterion (1) and criterion (5) appear to be implicated in this case.

10. During oral argument, counsel for the Defendant noted the federal government's objection to the Court's taking of evidence that was outside the Administrative Record. The Court considered this evidence not to substitute its findings for the Secretary's but to determine whether there was any evidence of such an impact as the record was completely devoid of such evidence or of any showing that NMFS had tried to obtain it.

this count collectively with Count One and the two counts are closely related. Plaintiffs argue in Count Six that Defendant failed to meet National Standard 8 of the Magnuson–Stevens Act, 16 U.S.C. § 1851(a)(8). Plaintiff's Complaint at ¶¶ 52–53. National Standard 8 provides,

> Conservation and management measures shall, consistent with the conservation requirements of this Act (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8).

The Defendant argues that the quota is in line with his obligation to prevent overfishing and rebuild overfished stocks. It is clear that the Defendant has a duty to rebuild overfished stocks, but the defendant also has a statutory obligation to balance that duty with his responsibility to minimize the adverse impacts on fishing communities such as those in North Carolina.

■ Defendant again attempts to rely on the fact that he set the 1997 quota at the same level as the 1996 quota as evidence that he complied with National Standard 8. This justification is ludicrous. When the 1996 quota was published, National Standard 8 was not part of the Magnuson–Stevens Act. There is no evidence that this quota complied with National Standard 8 in 1996. Therefore, even if no conditions changed between 1996 and 1997, which the Court highly doubts, there is no evidence that this quota complied with National Standard 8 in 1997. The very reason National Standard 8 was added to the Magnuson–Stevens Act was that there was no requirement in the Act that "fishery management councils ... try to minimize the adverse economic impacts of fisheries regulations on fishing communities." 142 Cong. Rec. S10794–02, S10825 (daily ed. Sept. 18, 1996) (statement of Sen. Snowe).

■ Defendant contends that "the Magnuson–Stevens Act does not require a thorough analysis of alternatives" and that a requirement that NMFS "consider a range of alternatives to the proposed rule setting the quota ... is without legal precedent." Federal Defendant's Response at 11. Certainly, it is without "legal precedent" as the law only came into effect within the last year. If the Court were to follow the Defendant's line of reasoning, National Standard 8 would be written out of the statute by NMFS within that same short period of time. Granted, administrative agencies have a substantial amount of discretion in determining how they will follow Congressional mandates. That discretion, however, does not include rewriting or ignoring statutes. NMFS is required not only to "take into account the economic impact," Federal Defendant's Response at 11, but also, "to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8).

Accordingly, the Court finds that the Secretary acted arbitrarily and capriciously in failing to comply with National Standard 8 and REMANDS the quota to the Secretary and ORDERS the Secretary to perform a level of economic analysis sufficient to comply with National Standard 8 and "to the extent practicable, minimize the adverse economic impacts on [fishing] communities." *Id.* Whether this analysis is done in conjunction with the analysis the Court has ordered in regard to the Regulatory Flexibility Act or separately is left to the discretion of the Secretary. Again, the Court ORDERS the Secretary to report the results to this Court by December 1, 1997.

**Count Two**

In Count Two, Plaintiffs argue that Defendant violated the APA because the 1997 summer flounder quota does not allow for the achievement of "optimum yield" on a continuing basis contrary to the requirements of National Standard 1 of the Magnuson–Stevens Act, 16 U.S.C. § 1851(a)(1). Plaintiff's Complaint at ¶¶ 36–38.

■ The crux of Plaintiffs' argument seems to be that because less fish will be fished than the initial quota allows (because of the subtraction of the overages from the quota), optimum yield is not being achieved.

Plaintiffs', however, misconstrue the term "optimum yield." The District of Columbia Circuit has defined optimum yield as "maximum yield *less* whatever amount need be conserved for economic, social or ecological reasons." *C & W Fish Co., Inc. v. Fox*, 931 F.2d 1556, 1563 (D.C.Cir.1991). This Court has also held that " 'optimum yield' is not the same as 'maximum yield.' " *J.H. Miles & Co. v. Brown*, 910 F.Supp. 1138, 1148 (E.D.Va.1995). Furthermore, optimum yield is measured on a continuing basis, therefore "management measures must aim to achieve, on a continuing basis, the optimum yield from each fishery, not the optimum yield in a single year." *Id.*

The Court finds that the Secretary did not violate National Standard 1 and GRANTS the Secretary's motion for summary judgment on Count Two.

**Count Three**

During oral argument, Plaintiffs withdrew Count Three which alleged that Defendant violated the APA because it failed to comply with National Standard 2 of the Magnuson–Stevens Act, 16 U.S.C. § 1851(a)(2), which requires that conservation and management measures be based on the best scientific information available. Plaintiff's Complaint at ¶¶ 40–42. Therefore, Count Three is DISMISSED WITH PREJUDICE.

**Count Four**

In Count Four, Plaintiffs argue that Defendant violated the APA because the 1997 summer flounder quota for North Carolina discriminates between residents of different states in violation of National Standard 4 of the Magnuson–Stevens Act, 16 U.S.C. § 1851(a)(4). Plaintiff's Complaint at ¶¶ 44–46.

Plaintiffs argue that NMFS used North Carolina's numbers in determining North Carolina's overage but used its own (NMFS's) numbers in calculating the overages of other states. The federal government claims that it used its own numbers in calculating North Carolina's overage for 1995; however, counsel for the Defendant could not point to an accounting of how NMFS arrived at the final number of 592,748 pounds. What is clear is that the federal government was alerted to the discrepancy between its numbers and North Carolina's numbers for 1995 by the State of North Carolina. At some point after being made aware of the discrepancy, NMFS decided, in economic parlance, to audit North Carolina's numbers in the agency's own fashion.

■ The Mid–Atlantic Fishery Management Council noted in its discussions regarding the 1997 management measures that under-reporting in the various fisheries may be as high as 30%. Minutes of the Mid–Atlantic Fishery Management Council Meeting, September 17–19, 1997, at 6, 9, 58, A.R. at 307, 310, 359. Thus, presumably NMFS's audit of North Carolina brought North Carolina's numbers more in line with the actual number of fish caught. Despite NMFS's awareness that its figures are inaccurate and its knowing that there is approximately 30% under-reporting, NMFS did not audit any other fishery besides North Carolina's. The Court finds that NMFS's actions amount to a violation of National Standard 4.[11]

■ The Court finds, however, that this violation did not prejudice the Plaintiffs for two reasons. First, Plaintiffs admit there were overages and their own figures were higher than those ultimately arrived at by the federal government. Second, counsel for Plaintiffs conceded during oral arguments that "for the purposes of [Plaintiffs'] remedy" it was "willing to accept that there is a number of 592 thousand pounds which they took as an overage which should not have been taken." Excerpt of Proceedings, September 22, 1997 Hearing. Although focusing on the fact that the number was derived from North Carolina's figures, Plaintiffs never made a showing that the number was lower than 592,748 pounds. Therefore, because there is no prejudice shown by the Plaintiffs, the Court must uphold the Secretary's actions as they relate to National Standard 4 as it has no figure to substitute therefore. *See J.H. Miles & Co.*, 910 F.Supp. at 1146.

---

11. The Court also notes another differentiation in the treatment of North Carolina: North Carolina was the only state to have its 1996 quota adjusted in *December, 1996* long after it was feasible for the state to adopt a plan to account for the overage during the 1996 fishing season.

Even though the Court finds for the Secretary, it questions NMFS's actions. Auditing only North Carolina and not any other state seems on its face to be extremely unfair because, when analyzing the stock assessment and setting the 1997 quota, under-reporting was assumed. Minutes of the Mid-Atlantic Fishery Management Council Meeting, September 17–19, 1997, at 6–11, A.R. at 307–12. The severely close auditing of North Carolina implies that there was some reason to hold North Carolina to a higher standard than other states. The fact that North Carolina has participated in other suits, *see Fishermen's Dock Cooperative,* 75 F.3d 164, should not cause NMFS to apply different standards to North Carolina than it applied to other states. If the agency desires in effect to audit North Carolina's records, then it should audit other states as well as it is a coastwide quota. Thus, although North Carolina was judged differently by the NMFS and the Secretary could not show the basis for NMFS's determination of the overage other than North Carolina's own figures, this Court cannot find prejudice from what Plaintiffs admit was an overage.

## Count Five

Plaintiffs withdrew Count Five during oral argument. Count Five alleged that Defendant did not meet National Standard 6 of the Magnuson–Stevens Act, 16 U.S.C. § 1851(a)(6), requiring that conservation and management measures take into account and allow for variations among, and contingencies in fisheries, fishery resources, and catches. Plaintiff's Complaint at ¶¶ 48–50. Accordingly, this Court DISMISSES Count Five WITH PREJUDICE.

**12.** The Governor and Senator from North Carolina after inquiries and meetings had one understanding of what would be deducted from the 1997 quota while the Secretary and his representatives had another. Each side left the same meeting with a different view as to whether the 1995 overage was to be deducted from the 1997 quota. The position of the agency was that only the 1996 overage would be deducted from the 1997 quota. The North Carolina representatives believed the 1995 quota would not be deducted from the 1997 quota. However, later the agency's position was clarified when the 1996 quota was adjusted on December 10, 1996 for the 1995 overage, and then the entire 1996 overage was

## Count Seven

Plaintiffs argue that Defendant violated the APA because the 1997 fishing quota applied overages from 1995 and 1996 against the 1997 quota and therefore violated 50 C.F.R. § 648.100(d)(2). Plaintiff's Complaint at ¶¶ 56–60. Section 648.100(d)(2) of 50 C.F.R. states that, "[a]ny overages of the commercial quota landed in any state will be deducted from that state's annual quota for the following year."

■ The federal government complied with the letter of the law in a most undesirable fashion.[12] On December 10, 1996, the federal government subtracted the 1995 overage of 592,748 pounds from North Carolina's 1996 adjusted quota (adjusted from the transfer to Virginia, *see supra* note 4), to reach an adjusted 1996 quota of 2,451,068 pounds. North Carolina fisherman landed 3,688,217 pounds of fish in 1996; therefore, there was an overage of 1,237,149 pounds for 1996. This overage was subtracted from the 1997 quota of 3,049,589 to arrive at an adjusted 1997 quota of 1,812,440 pounds. *See supra* Fig.1. Although, practically speaking, the timing of the quota adjustment essentially led to 1995's overage being applied to 1997's quota, technically, and therefore, legally, the overage was applied to 1996 quota. Accordingly, the Courts GRANTS summary judgment to the Defendant on Count Seven.[13]

## Count Eight

Plaintiffs argue that the adjusted quota was set in violation of the APA because 50 C.F.R. § 648.100(c) requires that the Regional Director of NMFS publish a proposed rule in the Federal Register by October 15 to

then deducted from the 1997 quota. Thus, according to the agency, the 1995 overage was not deducted from the 1997 quota. While the agency's action was legally correct, it is not a desirable way to do business.

**13.** The Court takes this opportunity to reiterate its determination below that the Secretary and NMFS *must* find a way to determine overages and adjust quotas in a reasonable amount of time so that states are able to respond to the information in such a way so as to avoid the devastating effect that this late determination has had on North Carolina.

implement a coast wide commercial quota, but in 1996 the proposed rule was not published until December 18. Plaintiff's Complaint at ¶¶ 62–64.

Under the Magnuson–Stevens Act, a party challenging a regulation promulgated by the Secretary must do so within 30 days of promulgation or publication of the regulation. 16 U.S.C. § 1855(f). Therefore, while Plaintiffs are correct that the proposed rule was published more than two months after it was supposed to be, they are barred by the statute of limitations from raising this claim. The Court GRANTS the Secretary's motion for summary judgment on Count Eight.

### Count Nine

In Count Nine, Plaintiffs allege that Defendant violated the APA and the Magnuson–Stevens Act because it failed to adequately police the federally-permitted fisheries dealers to assure that landings were reported accurately and timely as required by 50 C.F.R. § 648.7(a)(1). Plaintiff's Complaint at ¶¶ 66–69.

■ The Secretary defends himself on this count by arguing that NMFS did not collect the information it was supposed to because of its negotiations with North Carolina. As stated above, *see supra* note 3, NMFS and North Carolina never reached a final agreement. The federal government also argues that "plaintiffs' suggestion that NMFS has the responsibility or ability to monitor every landing in every state and to monitor which purchasers are not adequately reporting landings is untenable." Defendant's Brief in Support of Summary Judgment at 26. Yet, given that it is the federal government's responsibility to determine the quota from year to year, and it has decided that overages for any given year will be

subtracted from the succeeding year's quota, that is exactly what the federal government must do. Not only must the government make these determinations, but it must do so in a reasonable amount of time so that states have at least a remote chance of making adjustments to their own fishery management schemes which will enable them to comply with the quota set by the federal government.

While the Court cannot go so far as Plaintiffs' request and order the government to publish the adjusted quotas by January 1 of each year, an order better left to Congress, the Court can and does ORDER the Secretary to publish the final adjusted quota within a reasonable period of time to enable the fisherman to utilize the quota appropriately.

### Count Ten

In their final claim, Plaintiffs allege that Defendant violated the APA and Magnuson–Stevens Act because the Defendant used the 1995 harvest numbers in determining the 1997 quota and then reduced the 1997 quota by the 1995 overage. ¶¶ 71–72.[14]

In essence, Plaintiffs argues that all the fish that have been caught, including overages, are considered in the stock assessment. The stock assessment is then used in determining the quota. The overages are then subtracted from the quota once it is determined even though these numbers were already considered in determining the stock assessment. Therefore, according to Plaintiffs, there is a "double counting."

■ Plaintiffs are correct that the amount of summer flounder overfished are included in calculating the stock assessment.[15] While this may, in fact, be a kind of

---

**14.** Plaintiff explains the application of the 1995 overage to 1997's quota as follows:

> The [Mid–Atlantic Fishery Management Council committee responsible for calculating proposed summer flounder fishery quotas, [sic] uses the state's information data base for the last available year to calculate the next year's proposed quota. Since the 1996 fishing year was ongoing when quota calculation started in June, 1996, the 1995 landings were used in the calculation of the 1997 quota.

> Plaintiff's Complaint at ¶ 71.

**15.** The Summer Flounder Monitoring Committee will annually review the best available data including, but not limited to, commercial and recreational *catch/landing statistics, current estimates of fishing mortality, stock status*, the most recent estimates of recruitment, VPA results, target mortality levels, beneficial impacts of size/mesh regulations, as well as the level of *noncompliance by fishermen or States* and recommend to the Council Committee and ASMFC Interstate Fishery Management Program (ISFMP) Policy Board commercial (annual quota, minimum fish size, and minimum mesh size) and recreational

"double counting," it violates neither the Magnuson–Stevens Act nor the Administrative Procedure Act. The subtraction of overages called for in 50 C.F.R. § 648.100(d)(2) is a form of punishment meant to act as a deterrent to prevent overfishing in the future. Without this deterrent, fisherman could overfish every year with no consequences, and NMFS would have no means whatsoever to ensure compliance with the quotas. While another means of punishment may have been chosen, subtraction of overages is the most practical method which has been adopted for this purpose.

If Plaintiffs had wanted to challenge this method, they should have done so with 30 days of promulgation or publication of the regulation. *See* 16 U.S.C. § 1855(f). Having failed to do so, Plaintiffs must abide by the regulation until such time as they convince the Secretary or Congress to change it. Accordingly, the Court GRANTS Defendant's motion for summary judgment on Count Ten.

### III. Conclusion

In conclusion, the Court notes that the NMFS's actions in this case are troublesome. The federal government indicates in one instance that the 1997 quota was arrived at separately and expertly. In another, the government indicates that, because the 1997 quota was the same as the 1996 quota, there is no need to conduct any analysis to determine whether the quota has any significant economic impact. Finally, the most substantial problem in this case could have been avoided had the NMFS acted in a timely manner in adjusting the 1996 quota the first place.

Accordingly, the Court REMANDS the quota to the Secretary of Commerce and ORDERS the Secretary to conduct the requisite level of analysis to determine whether a certification of no significant impact is appropriate under § 605(b) of the Regulatory Flexibility Act and an economic analysis sufficient to comply with National Standard 8 of the Magnuson–Stevens Act. Furthermore, the Court ORDERS the Secretary to fix each

(possession and size limits and seasonal closures) measures designed to assure that the target mortality level on summer flounder is not exceeded . . . .

year's fishing quota including adjustments, within a reasonable period of time.

The Court DISMISSES Counts Three and Five WITH PREJUDICE; and the Court GRANTS Defendant's motion for summary judgment on Counts Two, Four, Seven, Eight and Ten.

IT IS SO ORDERED.

Measures to Attain Management Measures § 9.1.2.2, A.R. at 7 (emphasis added).