**NORTH CAROLINA FISHERIES ASSOCIATION, INC., Georges Seafood, Inc., Plaintiffs,**

State of North Carolina, ex rel. Michael F. Easley, Governor, and North Carolina Department of Environment, Health, and Natural Resources, Plaintiff–Intervenors,

v.

**Donald L. EVANS, Secretary of Commerce, Defendant.**

Civil Action No. 297CV339.

United States District Court, E.D. Virginia, Norfolk Division.

July 30, 2001.

Waverley Lee Berkley, III, McGuire Woods LLP, Norfolk, VA, Mark Steven

Davis, Carr & Porter, LLC, Portsmouth, VA, for North Carolina Fisheries Association, Inc., Georges Seafood, Inc.

Amy R. Gillespie, North Carolina Department of Justice, Daniel F. McLawhorn, North Carolina Dept. of Environment & Natural Resources, Raleigh, NC, Michael Vincent Hernandez, Professor, Regent University School of Law, Virginia Beach, Lois J. Schiffer, U.S. Department of Justice, Environmental Enforcement Section, Eileen Sobeck, Office of the Attorney General, Environment & Natural Resources Division, Wildlife & Marine Resources Section, Warigia Bowman, Wildlife and Marine Resources Section, United States Dept of Justice, Charles R. Shockey, U.S.Department of Justice, Environmental & Natural Resources Div., Washington, DC, for the State of North Carolina.

Richard Ernest John Slaney, Wolcott, Rivers, Wheary, Basnight & Kelly, P.C., Virginia Beach, VA, for Natural Resources Defense Council.

## OPINION & ORDER

DOUMAR, District Judge.

This matter is before the Court on Plaintiff North Carolina Fisheries Association, Inc.'s and Georges Seafood, Inc.'s (collectively, "Plaintiffs") Motion to Enforce the Court's Order. The Court held a hearing on this matter on Wednesday, April 18, 2001. At that hearing, for reasons stated on the record, the Court granted the Plaintiffs' Motion and found as a matter of fact that the Defendant Secretary of Commerce ("Secretary") was not in compliance with the Court's prior orders in this case. At the hearing, and also for reasons stated on the record, the Court ordered the Secretary not to make any additional adjustments to North Carolina's 2001 summer flounder quota, and the Court took under advisement the issue of whether additional sanctions were appropriate. This Opinion and Order clarifies those rulings, and imposes further sanctions on the Secretary. Consequently, for the reasons set forth below, Plaintiffs' Motion to Enforce the Court's Order is **GRANTED** and the Defendant is **ORDERED** not to make any further penalty adjustments in 2001 or any year thereafter to North Carolina's summer flounder quota based on fishing overages from 2000. Also, for the reasons set forth below, the Defendant is **ORDERED** to pay the reasonable attorneys' fees incurred by Plaintiff in connection with the instant motion.

### I. Background

This is the third installment of a case that has been heavily litigated in this Court for the past five years. As such, the Court is quite familiar with the mechanics of the summer flounder fishery in North Carolina and the applicable statutes and regulations. Similarly, the parties are doubtlessly well-aware of the Court's prior decisions in this case that remain the law of the case. Those decisions, which accurately report the backdrop to the instant dispute, are reported in *North Carolina Fisheries Ass'n v. Daley,* 16 F.Supp.2d 647 (E.D.Va.1997) (hereinafter *Daley I* ), and *North Carolina Fisheries Ass'n v. Daley,* 27 F.Supp.2d 650 (E.D.Va.1998) (hereinafter *Daley II* ). The following facts are most relevant for purposes of the instant motion.

### A. Daley I and Daley II

Plaintiffs brought suit in 1997 challenging the 1997 summer flounder quota developed by the National Marine Fisheries Service ("NMFS"). Specifically, plaintiffs charged that (1) the 1997 quota did not comply with the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 611(a)(2), or the Magnuson–Stevens Act ("M–SA"), 16 U.S.C. § 1855, in that regulators failed to consid-

er the economic impact of the quota on small entities; and (2) the Secretary failed to publish the 1997 final *adjusted* quota for summer flounder within a reasonable time where, due to certain subtractions from the 1997 quota because of fishing overages from 1995 and 1996, a final *adjusted* quota for calendar year 1997 was not published until July 7, 1997. The evidentiary record in this case illustrates that such delay causes considerable hardship to Plaintiffs since North Carolina's summer flounder fishery is prosecuted primarily during the winter months when prices are higher, and without knowing what North Carolina's portion of the final adjusted quota may be until July, the North Carolina fishermen are unable to intelligently allocate their gear or resources or apportion their share of the quota between the winter and fall fisheries. Consequently, in *Daley I*, the Court (1) remanded the quota to the Secretary to determine the level of economic impact the quota would have on small entities, pursuant to the RFA and the M–SA; and (2) the Court ordered the Secretary "to fix each year's fishing quota *including adjustments* within a reasonable period of time." *Daley I*, 16 F.Supp.2d at 658 (emphasis added).

After remand, the Secretary filed an economic impact analysis, and both sides moved for summary judgment. In *Daley II*, the Court held that (1) the agency's economic analysis did not comply with either the RFA or the M–SA; and (2) the appropriate remedy was to set aside the 1998 quota by the total amount of penalty adjustment that the Secretary applied in 1998 for overfishing in 1997. *See Daley II*, 27 F.Supp.2d at 650. The Court also found that because the penalty adjustment or overage was announced and applied by the NMFS in an untimely fashion, the

1997 overage could not be considered by the NMFS in setting a summer flounder quota for any subsequent years. *See id.* The Court stated that the "Secretary's responsibilities are not only to establish quota regulations but to do so in an honest and timely manner," a task at which the Secretary failed abysmally in 1998. *See id.* at 666–68. The Court also cautioned the Secretary that, in lieu of the fact that the Secretary had shown little or no regard for the Court's orders, the Court would "not hesitate to enforce its orders to the fullest extent." *Id.* at 669. The Court stated its desire to "hold accountable any individual whose actions are contemptuous of this Court." *See id.* In this respect, the Court "retain[ed] jurisdiction of these proceedings and may revisit the entire matter for purposes of enforcement of its prior orders." *Id.* The Secretary did not appeal either *Daley I* or *Daley II*, and thus these decisions remain the law of the case.

**B. Recent Litgation in the District of Columbia and the Regulatory Response**

Two years later, on April 25, 2000, the U.S. Court of Appeals for the District of Columbia issued a decision in a separate action brought by the National Resources Defense Council ("NRDC") to set aside the 1999 summer flounder quota. *See NRDC v. Daley*, 209 F.3d 747 (D.C.Cir. 2000) (hereinafter *NRDC I* ). The D.C. Circuit remanded the 1999 summer flounder quota to NMFS because the quota as set did not have at least a 50% probability of achieving the summer flounder fishery management plan's ultimate conservation goal or target reference point, which at the time was identified by the variable "F submax." *See id.* at 756.[1] The Opinion

---

1. The variable "F" refers to the fishing mortality management target as specified in the

fishery management plan. The following discussion of the technical variables "F" and "F

also directed that the 2000 summer flounder quota and all future quotas must be set at a level that provides at least a 50% probability of not exceeding "F" or the target reference point with respect to the fishery management plan's conservation goals.

On May 24, 2000, NMFS published the final, unadjusted quota for the 2000 summer flounder fishery. *See* 65 F.R. 33486. NMFS stated, however, that it would potentially need to adjust the 2000 quota in response to the D.C. Circuit's Opinion in *NRDC I.* Therefore, in its May 24, 2000 rule, NMFS stated that if necessary it would adjust the 2000 quota by August 1, 2000.

The August 1, 2000 deadline established by the May 24, 2000 rule passed without the issuance of a final, adjusted quota for the 2000 summer flounder fishery. Instead, on August 2, 2000, NMFS issued an emergency interim rule for the summer flounder fishery, stating that NMFS would establish a quota for 2001 that would enable the NMFS to comply with the D.C. Circuit's Opinion in *NRDC I.* Under this emergency rule, the 2001 quota would, for the first time, strive to achieve a *biomass*[2]

submax" is offered in order to shed some light on these terms and the concepts they represent.

Under the M–SA, 16 U.S.C. §§ 1801–1183, regional Fishery Management councils are tasked with developing fishery management plans that "achieve and maintain, on a continuing basis, the *optimum yield* from each fishery." 16 U.S.C. § 1801(b)(4) (emphasis added). "Optimum yield" under the statute is defined as the "maximum sustainable yield from the fishery." *Id.* § 1802(28)(B). If a fishery is "overfished," the management plan must "provide[ ] for rebuilding to a level consistent with" the maximum sustainable yield. *Id.* § 1802(28)(C). A fishery is "overfished" if the rate of fishing mortality "jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *Id.* § 1802(29).

NMFS defines "overfishing" and "optimum yield" according to the variable "F," which represents the fishing mortality rate. More specifically, F represents that part of a fish species' total mortality rate that is attributable to harvesting by humans, whether through capture or discard. Values for F can range anywhere from 0 to over 2, and only indirectly represent the amount of fish captured by industry. For instance, an F of 1.4 means that about 20% of all summer flounder that are alive at year 1 will be alive at year 2. There is a specific F, termed "F submax," that is defined as that fishing mortality rate that will maximize the harvest of a single class of fish over its entire life span. "Overfishing" is thus fishing in excess of F submax. *See* Amendment 7 to the Fishery Management Plan for the Summer Flounder Fishery at 9

(May 1995). In sum, the basic goal of a fishery management plan is to achieve F submax, thereby preventing overfishing and sustaining optimum yield.

2. In a very general sense, a "biomass" target is achieved by estimating the total mass of a fishery, and arriving at a suitable harvest level that allows the fishery to maintain its maximum sustainable yield. Scientists estimate the biomass of a species by using a technique called virtual population analysis, or VPA. *See* Terceiero Dec. ¶ 2(c). The VPA is an age-structured population model in which the totals of the fishery catches of fish born in the same year (also referred to as a cohort or year-class) over their life span are extrapolated to arrive at an estimation of overall population numbers, biomass, and mortality rates. *See id.*

The ideal biomass for summer flounder is considered to be the biomass that provides maximum sustainable yield, or MSY, from the stock. *See id.* at 2(a). The MSY is defined as "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological and environmental conditions." 50 C.F.R. § 600.310(c)(1)(i). Currently, the biomass target for summer flounder is estimated to be 106,444 metric tons, or 235 million pounds. *See* Terceiro Dec. ¶ 2(a). Summer flounder are "overfished" when the biomass target falls below the "minimum biomass threshold," equal to one-half the biomass target, or 53,222 metric tons (117 million pounds). *See id.* In the most recent stock assessment conducted in June 2000, NMFS scientists esti-

target of summer flounder in place of the "*F*" target (or fishing mortality rate) that would have been achieved at the end of 2001 if the F target had been met in 1999 and 2000 with a 50% probability, thus making the 2001 quota consistent with the D.C. Circuit's Opinion in *NRDC I*. Thus, under the rule, the biomass target replaces the F target in the fishery management plan for summer flounder as the base reference point for measuring the overall success of the NMFS's efforts to rebuild the nation's stock of summer flounder. This emergency interim rule extended the deadline for establishing the quota for 180 days, until January 29, 2001.

On June 23, 2000, the NRDC and other environmental groups filed a second action against the Secretary in the U.S. District Court for the District of Columbia. *See NRDC v. Minetta*, Civ. No. 1:00cv01481 (D.D.C. filed June 23, 2000) (hereinafter *NRDC II* ). This lawsuit requested that the district court order the Secretary to revise the 2000 summer flounder quota to prevent overfishing and act consistently with the fishery management plan for summer flounder, as interpreted by the D.C. Circuit in *NRDC I*. On November 1, 2000, the D.C. district court entered a settlement order in *NRDC II*. That settlement order states that, although the Secretary failed to reduce fishing mortality via the 2000 summer flounder quota as required by the remand from the D.C. Circuit in *NRDC I*, the Secretary represents that it will take certain steps with respect to the 2001 summer flounder quota to restore the summer flounder population by the end of 2001 to the size it would have been had the Secretery set quotas in 1999 and 2000 consistent with the D.C. Circuit's

Opinion in *NRDC I*. The settlement agreement required NMFS to publish a final rule by December 31, 2000 that would establish a 2001 summer flounder quota with a 50% probability of achieving the fishing mortality rate that retrospectively would have resulted in maximum yield per recruit in both 1999 and 2000, as well as prospectively for 2001.

On November 28, 2000, NMFS published a proposed rule to implement the goals set forth in the above-noted August 2, 2000 emergency interim rule as well as the November 1, 2000 settlement agreement in *NRDC II*. This proposed rule recommended a federal summer flounder quota of 17.91 million pounds for calendar year 2001, which would be divided into a commercial quota of 10.75 million pounds and a recreational quota of 7.16 million pounds. The proposed rule provided for a summer flounder commercial quota for North Carolina of 2,507,289 pounds.

Three days later, however, on December 1, 2000, the Atlantic States Marine Fisheries Commission ("ASMFC") announced that its 2001 coast-wide summer flounder quota would be 20.5 million pounds, or 2.59 million pounds more than the figure in the proposed rule published by the NMFS on November 28, 2000. The ASMFC quota is extremely important to understanding the instant dispute as the summer flounder fishery is prosecuted in both federal waters (from three to 200 miles off the East Coast of the United States) and state waters (from zero to three miles off the East Coast), and, like many saltwater species, summer flounder swim both inshore and offshore oblivious to such jurisdictional demarcations.[3] The responsibility for managing Atlantic coastal fisheries (like sum-

mated the summer flounder biomass in 1999 to be 41,449 metric tons (91 million pounds).

**3.** Nonetheless, approximately 70% of the commercial landings for summer flounder

come from federal waters. *See* 31st Northeast Regional Stock Assessment Workshop–Stock Assessment Review Committee Consensus Summary of Assessments, October 2000.

mer flounder) in state waters therefore rests with the states, not NMFS. The states regulate Atlantic coastal fisheries through the ASMFC, which is a cooperative program of fisheries oversight and management between the Atlantic coastal states. Although the ASMFC and the NMFS generally work cooperatively to support and encourage the development, implementation, and enforcement of effective interstate conservation and management of summer flounder, for whatever reason this was not the case with respect to the proposed 2001 summer flounder quota.[4] The Plaintiffs in the instant action represent that the explanation for the 2.59 million-pound difference between the ASMFC quota and the NMFS quota is that the ASMFC's recommendation was based upon an assumption of holding the summer flounder quota at 20.5 million pounds for two years and upon continuing to use a fishing mortality target of $F = 0.26$, while, as explained above, the NMFS, in response to the D.C. Circuit's decision in *NRDC I* and the settlement agreement in *NRDC II*, shifted from the traditional method of using a fishing mortality target or F target to using a biomass target.

Thus, in January 2001, at the start of the highly profitable winter fishing season for summer flounder off North Carolina, and as the result of a lack of an established, final quota for 2001 from the NMFS, the State of North Carolina made several forced assumptions regarding the 2001 summer flounder quota in order to prevent the assessment of future penalties in 2002 or beyond for over-fishing its quota in 2001—which of course the NMFS had failed to establish! Regrettably, as the prior history of this litigation demonstrates, the North Carolina fishermen are by now well-practiced at this absurdly illogical guessing game. As customary, therefore, North Carolina reserved 70% of its share of the 2001 summer flounder quota for the winter fishing season, which began January 1, 2001. The state reserved the remainder of its share of the 2001 quota (30%) for the fall fishing season.

On January 29, 2001—one month after the North Carolina winter fishing season began-NMFS still had not issued a final, adjusted 2001 quota, but, instead, issued a second "emergency interim rule," 66 F.R. 8091, which stated that it "may not"[5] be possible for the NMFS to publish a final rule to implement the final specifications for the 2001 summer flounder fishery prior to January 29, 2001, the expiration date of the emergency interim rule announced on August 2, 2000. Thus, the NMFS extended its own deadline for issuing final specifications for the 2001 summer flounder fishery until July 28, 2001, and also continued the effectiveness of the biomass target that NMFS used to establish the 2001 quota.

4. Although the ASMFC initially set a higher quota for state waters, and, thus, one might assume that Plaintiffs could avail themselves of this additional 3 million pounds of summer flounder, such is not the case. Plaintiffs could not catch or benefit from this additional poundage because they must comply with the NMFS quota or lose their federal fishing permits. Commercial fishermen in North Carolina's summer flounder fishery generally hold three permits: (1) an NMFS-issued vessel permit; (2) an NMFS-issued operator's license; and (3) a State of North Carolina-

issued landing license. If North Carolina's commercial fishermen desired to avail themselves of the higher ASMFC quota, then they would have to surrender their federal licenses and only fish in state waters.

5. Probably the January 29, 2001 rule was prepared much earlier than January 29 but was not released until January 29, which explains the wording in the rule "may not" instead of "Was not."

### C. Plaintiff's Instant Motion to Enforce the Court's Order

Against that factual and regulatory backdrop, on February 12, 2001, the Secretary foreshadowed the instant dispute by filing with this Court a "Notice Concerning Status of 2001 Summer Flounder Specifications." With this notice, the Secretary advised the Court as well as Plaintiffs that the NMFS had yet to publish a final regulation specifying the final, unadjusted summer flounder quota for 2001 ostensibly due to factors outside the NMFS's control. Specifically, NMFS blamed the delay on the actions of the ASMFC in setting the state quota at 20.5 million pounds as opposed to the federal quota of 17.9 million pounds, and the necessity for the NMFS to resolve this discrepancy prior to issuing a final quota so as to achieve compliance with the D.C. Circuit's mandate in *NRDC I* that the summer flounder quota must be set at a level providing at least a 50% probability of achieving the summer flounder fishery management plan's conservation goals or target reference point, as measured by the overall biomass of the summer flounder stock.

The Secretary's Notice of February 12 undoubtedly sparked the instant Motion to Enforce the Court's Order, filed by Plaintiffs on March 3, 2001. With this motion, Plaintiffs again make the by now well-established argument that NMFS's failure to set a final summer flounder quota in a timely manner severely compromises the ability of North Carolina's fishermen to efficiently prosecute the winter flounder fishery that occurs off North Carolina. Plaintiffs in the instant motion maintain and the established record of this case indeed reflects that summer flounder historically provide greater profits to North Carolina's commercial fishermen in the winter fishing season than the fall season for two reasons: (1) the fall season sometimes does not begin until December because of unfavorable weather conditions, and thus the fishermen may have an insufficient time to catch their remaining quota, which cannot be carried over into the following year; and (2) prices for summer flounder are typically higher during the winter months. Therefore, as a result of the NMFS's failure to provide a timely, final 2001 summer flounder quota, Plaintiffs assert that the forced assumptions of the State of North Carolina with respect to the as-yet-unannounced 2001 quota closed the profitable winter season for summer flounder on February 15, 2001, leaving Plaintiffs in a lurch as to what use to make of their fishing gear and crews, as well as how to appropriately apportion and conduct their fishing efforts for the remainder of the 2001 summer flounder fishery.

Fifteen days later, on March 23, 2001, consistent with the 2001 quota initially proposed on November 28, 2000, NMFS published a "final summer flounder quota" of 17.9 million pounds, exclusive of any additional adjustments to the quota based on overages from the 2000 quota. North Carolina's portion of the 2001 final quota-exclusive of any additional adjustments-amounts to 2,651,470 pounds. That amount already reflects a 298,281 pound deduction from the quota initially proposed for North Carolina (2,949,751 pounds) due to North Carolina's overages from 2000. *See* March 20, 2001 Hogarth Dec. ¶ 14.[6]

---

**6.** Interestingly, on December 27, 2000, the North Carolina Division of Marine Fisheries submitted a weekly and cumulative report of calendar year 2000 summer flounder landings in North Carolina up to December 12, 2000, when North Carolina's summer flounder fish-ery closed. This report reflected an overage from North Carolina's 2000 quota of 315,339 pounds. On March 23, 2001, however, NMFS published the 2001 summer flounder quota showing a 2000 overage for North Carolina of 298,281 pounds. *See* 65 Fed.Reg.

Thus, although the 2001 quota as issued already reflects certain adjustments based on North Carolina's 2000 overages, with the issuance of this quota NMFS also reserved the right "[a]s new data becomes available from the State of North Carolina concerning its 2000 landings" to make additional adjustments to the quota as may be necessary to have a 50% probability of attaining the 2001 biomass target and thereby remain in compliance with the D.C. Circuit's *NRDC I* decision and the settlement agreement in *NRDC II. See* Def.'s Br. in Opp. to Pl.'s Mot. at 2.

On April 17, 2001–the day prior to the Court's April 18, 2001 hearing-the Secretary filed a declaration from Dr. William T. Hogarth (hereinafter "April 17 Hogarth Declaration") in which Dr. Hogarth, the Acting Assistant Administrator for the Fisheries of the National Marine Fisheries Service, notified the Court and the parties that on April 3, 2001, the ASMFC lowered its 2001 summer flounder quota to 17.91 million pounds, the same as the federal quota. Also on April 17, 2001, the Secretary filed a declaration from Gregory Power (hereinafter the "Power Declaration"). Power serves as the Chief of the Fisheries Statistics Office in the Northeast Region of the National Marine Fisheries Service. The Power Declaration provides that the State of North Carolina did not provide the NMFS with "a breakdown of their summer flounder reported landings between Federal dealer purchases from vessels and State dealer purchases from State permitted vessels fishing exclusively in waters under the jurisdiction of the State" until April 17, 2001. *See* Power Decl. ¶ 2. Consequently, due to the need to verify the accuracy of the information provided by North Carolina, the Power Declaration states NMFS needs more time to publish a final, adjusted 2001 summer flounder quota.

## D. *The April 18, 2001 Hearing and Subsequent Filings*

The Court conducted a hearing on this matter on April 18, 2001, and, for the reasons stated on the record, the Court granted Plaintiffs' motion and held that the Secretary failed to comply with this Court's prior orders to set the summer flounder quota in a reasonable, timely fashion. The Court, for the reasons stated on the record, ordered that no additional adjustments be made to North Carolina's 2001 summer flounder quota on the basis of any overages from the 2000 quota and took under advisement the issue of whether additional sanctions against the Secretary were appropriate. The Court also directed the Secretary to file a declaration or affidavit addressing the Court's concerns with the manner in which the summer flounder quota is calculated and whether some level of under-reporting on the part of commercial fishermen and fish dealers is factored into the calculation of the stock assessment and biomass for the fishery, which in turn dictate how the quota is set. In this vein, the Court's primary concern was whether, in calculating the stock assessment and resultant quota, the NMFS continued to factor in some level of under-reporting on the part of fishermen or fish dealers. This becomes important because, in the prior history of this litigation, the record reveals that, in calculating

---

16153. According to Barbara Lupton, Section Chief of the License and Statistics Section of the North Carolina Division of Marine Fisheries, "North Carolina has no information how the NMFS overage was determined and why NMFS used the smaller number in announcing the adjustment, rather than the larger number which had been provided by North Carolina three months earlier." Lupton Aff. ¶ 9. Understandably, however, Plaintiffs do not take exception to the NMFS's use of the smaller number.

the stock assessment and resultant quota, NMFS generally assumed that the summer flounder landings were being under-reported by approximately 30%, see Daley II, 27 F.Supp.2d at 653 n. 3, which led the Court to conclude that the subsequent assessment of additional penalties to the current year's quota based on overages from the prior year's quota amounted to double-counting, and imposed an unreasonable penalty on the commercial fishing interests. See id. at 667.[7] At the April 18, 2001 hearing, however, counsel for the Secretary represented that the stock assessment and resultant quota no longer factor in some degree of under-reporting by either fishermen or fish dealers, and the Court directed the Secretary to submit a declaration or affidavit to that effect.

On April 30, 2001, the Secretary filed the declarations of Mark Terceiro[8] (hereinafter "Terceiro Declaration") and William T. Hogarth (hereinafter "April 30 Hogarth Declaration"). These affidavits are responsive to questions submitted to the Secretary by the Court at the April 18, 2001 hearing. Most relevant for purposes of the instant motion, the Terceiro Declaration states that "no under-reporting of the [summer flounder] landings is factored into the calculation of biomass or quotas." Terceiro Declaration ¶ 2(j). The Terceiro Declaration also explains the science behind the calculation of the summer flounder stock assessment and biomass in response to the Court's questions from the April 18, 2001 hearing. The April 30 Hogarth Declaration reposits the Secretary's

excuses for the delay in issuing a final, adjusted 2001 quota for summer flounder, primarily that NMFS desired to work with the ASMFC to set a standardized summer flounder quota.

Also on April 30, 2001, the State of North Carolina filed an affidavit from Barbara Yates Lupton, Section Chief of the License and Statistics Section of the North Carolina Division of Marine Fisheries (hereinafter the "Lupton Affidavit"). The Lupton Affidavit is responsive to the Power Declaration of April 18, 2001 in that the Lupton Affidavit explains the process by which the North Carolina Division of Marine Fisheries shares with NMFS information on North Carolina dealers within the limitations of North Carolina General Statute § 113–170.3, which addresses the confidentiality of the State's landings data and shares data. The Lupton Affidavit further states that N.C. Gen.Stat. § 113–170.3 prevents the State from sharing with NMFS particularized information with respect to the flounder landings, primarily the names or license numbers of the vessels and dealers along with a breakdown of each license holder's catch or landings, because the NMFS could in turn potentially use this information in an enforcement action against the licensee. Thus, while the State of North Carolina very willingly shares aggregate information in what appears to be a very timely fashion with NMFS regarding aggregate landings and other general information, the State does not share particularized information about the participants in the fishery. Consequently, it

---

7. Moreover, given that the participants in the North Carolina summer flounder fishery primarily fish on shares, the idea that commercial fishermen would under-report their landings strikes the Court as untenable since every crew member's take depends on the weight of the fish that are thrown on the dock. This creates a very strong incentive for accuracy in catch reports, less the captain of the vessel desires to face a mutinous and ill-tempered crew.

8. Terciero serves as the Leader of the Southern Demersal Fisheries Assessment Task Force of the Population Dynamics Branch, Northeast Fisheries Science Center, National Marine Fisheries Service, located in Woods Hole, Massachusetts.

is the State of North Carolina's position that it has fully and efficiently cooperated, to the extent permissible under North Carolina law, with every request for landings data from the NMFS, and that the State of North Carolina is in no way to blame for NMFS's delay in issuing a final 2001 summer flounder quota or making any adjustments thereto.

Having provided the reader with sufficient background for this dispute as well as the context of this litigation in the scheme of other litigation and regulatory action involving the NMFS, the Court now turns to the much easier task of resolving the instant motion.

## II. *Analysis*

The instant motion presents the straightforward issue of whether the Secretary has complied with this Court's prior orders and, if not, what sanction is appropriate.

Earlier in the history of this litigation, the Secretary issued the 1998 summer flounder quota on December 18, 1997, and made penalty adjustments to North Carolina's portion of that quota based on 1997 overages on January 23, 1998 and April 28, 1998. *See Daley II,* 27 F.Supp.2d at 668–69. The Court held that, in contravention of the Court's prior Order of October 10, 1997 to issue quotas and make adjustments thereto in a reasonable and timely fashion, the Secretary did not establish in a timely manner quota adjustments in 1998 based on the 1997 overages. *See id.* at 666–67. Consequently, the Court sanctioned the Secretary by setting aside the penalty adjustment to the 1998 quota based on the overages from 1997. *See id.* at 667.

■ The timing of the issuance of the final quota in 2001 as well as the seemingly unending possibility for additional adjustments thereto presents an even more egre-gious violation of this Court's prior orders. Here, the Secretary did not issue a final summer flounder quota for 2001 until March 20, 2001, and the Secretary readily admits that, although the 2001 quota already reflects certain adjustments based on North Carolina's 2000 overages, "[a]s new data becomes available from the State of North Carolina concerning its 2000 landings, NMFS will make any further, necessary adjustments to the quota as may be necessary to attain the 2001 biomass target." Def.'s Br. at 2.

The Secretary blames the delay in setting a final, adjusted 2001 summer flounder quota on two factors. First, the Secretary blames the ASMFC for setting a 2001 state-waters quota in excess of the federal quota, and therefore the Secretary represents that negotiations with the ASMFC in an effort to resolve this apparently unprecedented disagreement led or contributed to the delay. Second, although it is even less clear to the Court how this factor has caused delay in the instant case, NMFS seems to attribute part of the delay to certain alleged complexities associated with litigation in the D.C. Circuit, namely the *NRDC I* decision that ordered summer flounder quotas set at a level providing at least a 50% probability of achieving the management target specified in the fishery management plan.

The Court finds that neither of these two factors excuses the Secretary from its obligation to comply with this Court's prior orders that the Secretary issue quotas in a reasonable and timely fashion as well as that the Secretary actively investigate and monitor summer flounder landings from the prior year so that any overage adjustments to the current or successive year's quota can be made in a reasonable and timely fashion. Although the NMFS appears to take the position that it has unlimited discretion in setting or making ad-

justments to the 2001 quota, this Court's prior orders make clear that the NMFS does not enjoy such unlimited discretion, nor can the NMFS bait-and-switch the Court by representing that such unfettered flexibility is necessary to remain in compliance with the D.C. Circuit's decision in *NRDC I* and the settlement order in *NRDC II*. The portion of this Court's prior orders at issue in the instant dispute (that NMFS set the summer flounder quota in a reasonable and timely fashion) and the thrust of the D.C. Circuit's order in *NRDC* as well as the *NRDC II* settlement agreement (that NMFS set the summer flounder quota at a level that provides at least a 50% probability of achieving the fishery management plan's conservation target) do not conflict. Indeed, what good is a quota that meets the conservation goals of the fishery management plan if it is not announced until after the fishing seasons is over? Such a quota would be utterly worthless to commercial, recreational, and even environmental interests.

In addition, the Court is not swayed by the Secretary's argument that the difference between the proposed 2001 quotas by the NMFS and ASMFC somehow excuse the NMFS's delay in publishing a final, adjusted 2001 quota. The difference in quotas appears to be driven by the fact that both the NMFS and the ASMFC have traditionally relied upon a fishing mortality target or F in setting the quota, and that the NMFS has recently switched to using a biomass target in setting the quota. However, the fishery management plan is designed to serve as a joint plan between the NMFS and the ASMFC, and it seems reasonable that prior to making the decision to switch to a biomass target, the NMFS should have consulted with and come to an agreement on this issue with its plan partner, the ASMFC. The Court is in no way criticizing the NMFS for adopting the biomass target—this approach appears far less confusing and thus much more approachable than the older F standard—but this lack of agreement over the correct reference target simply does not excuse the NMFS's delay in announcing a final, adjusted quota. Therefore, the Court finds that the Secretary has acted in violation of the Court's orders of October 10, 1997 and September 28, 1998 and that sanctions are appropriate. The question now becomes what sanctions would provide the most deterrence to the Secretary in an effort to keep this Court from having to revisit these same issues time and time again.

■ Plaintiffs essentially propose two alternative sanctions. First, Plaintiffs ask that all adjustments to the 2001 quota that are based on North Carolina's overages from 2000 be set-aside, and thus 298,281 pounds would be added back into North Carolina's 2001 quota. Alternatively, Plaintiffs ask that the Secretary be sanctioned with an order not to make any additional adjustments in 2001 or in any subsequent year on this basis of any 2000 overages that might come to the NMFS's attention after the publication of the final, unadjusted 2001 quota on March 23, 2001.

The Court finds that this latter alternative-no additional adjustments to North Carolina's 2001 quota or any year thereafter on the basis of any overages from 2000-is most appropriate. The Court does not find that striking *all* the overages from 2000 that were factored into the final, unadjusted quota published on March 23, 2001 to be appropriate as the Court is satisfied by the evidence presented that NMFS no longer factors in some level of under-reporting by licensees in arriving at an estimation of the summer flounder stock assessment and biomass, which in turn dictate the setting of the quota. Thus, this is a different situation than the

one presented to the Court in *Daley II*. In addition, striking all adjustments might place NMFS in serious jeopardy of violating the D.C. Circuit's orders in *NRDC I* and *NRDC II*, a situation that the Court has no desire to encourage.

The sanction that the Court imposes is a reasonable one in that NMFS obviously has the capability of discovering North Carolina's overages Although NMFS complains that the task of monitoring the State's landings data in a timely fashion is a less-than-ideal situation, this is similar to arguments already lost by NMFS in the prior history of this case. In *Daley I*, NMFS argued that it was unreasonable to suggest that NMFS must monitor all landings to accurately and timely set the quota and make additional adjustments for overages. *See Daley I*, 16 F.Supp.2d at 657. The Court rejected this argument:

> [G]iven that it is the federal government's responsibility to determine the quota from year to year, and it has decided that overages for any given year will be subtracted from the succeeding year's quota, that is exactly what the federal government must do. Not only must the government make these determinations, but it must do so in a reasonable amount of time so that states have at least a remote chance of making adjustments to their own fishery management schemes which will enable them to comply with the quota set by the federal government.

*Id.* The Court went on to state that "[w]hile the Court cannot go so far as Plaintiffs request and order the government to publish the adjusted quotas by January 1 of each year, an order better left to Congress, the Court can and does [order] the Secretary to publish the final adjusted quota within a reasonable period of time to enable the fishermen to utilize the quota appropriately." *Id.* This remains the law of the case.

In addition to sanctioning the Secretary with an order not to make any additional adjustments to North Carolina's 2001 summer flounder quota or any year thereafter on the basis of overages from 2000, the Court also sanctions the Secretary with an order to pay the reasonable attorneys' fees incurred by Plaintiffs in connection with the instant dispute. This sanction is particularly appropriate where, as here, Plaintiffs seem to get results, including the issuance of a final, unadjusted quota for 2001 after the conclusion of North Carolina's 2001 winter fishing season, only by coming to the Court for assistance. The Plaintiffs are to present a statement of their reasonable attorneys' fees to the Defendant within ten days of the entry of this Opinion and Order, and the Court encourages the parties to resolve among themselves any disputes that may arise in connection with Plaintiffs' request for attorneys' fees before turning to the Court for assistance. If the parties are unable to agree on the Plaintiffs' reasonable attorneys' fees, then Plaintiffs shall thereafter file the appropriate papers with this Court within thirty days from the entry of this Opinion and Order. The Defendant shall thereafter have an opportunity to respond to Plaintiffs' filing in accordance with the local rules, and the Court will decide the issue.

Before closing the chapter on the latest installment of this litigation, the Court reminds the Secretary that the prior orders of this Court remain in full effect, and the Court shall continue to retain jurisdiction over this case to see that those orders are abided by. In sum, the Secretary must find a way to publish final quotas and make any adjustments thereto in a reasonable and timely manner so that all participants in the summer flounder fishery are

on the same boat. One of the reasons for having a fishery management plan in the first place is to lend a degree of certainty to the fishery management process so that all interests involved-the stakeholders, the dealers, the regulators, the recreational interests, and the environmentalists-can best plan how to achieve their respective goals. However, without the timely issuance of either a final quota or a final, adjusted quota then such management and business decisions are only guesses. This is no way to manage our nation's natural resources. Yet even in the midst of this unfortunate situation, and largely due to the concerted efforts of all interested parties, the long-term outlook for summer flounder appears to be positive. The biomass of this dynamic fishery appears to have increased from 86 million pounds in 1995 to 91 million pounds in 1999, *see* Terceiro Dec. ¶ 2(b), and, according to some news reports from the recreational front, flounder "have made a wonderful return to prosperity." Lee Tolliver, *Fishing Forecast*, Va. Pilot, July 26, 2001, at C8 (stating that "[f]lounder, because of tight restrictions, have made a wonderful return to prosperity-much like the striped bass and gray trout," and that Virginia recreational anglers "are on pace to break the record for most flounder citations in one year"). If this momentum is to be sustained, the Secretary must find a way to calculate and publish quotas in a reasonable and timely fashion, as the Secretary and all the interests involved waste too many resources that could be better spent actually managing the summer flounder fishery instead of relitigating the same issues in this Court time and time again.

### III. *Conclusion*

For the reasons set forth herein, Plaintiff's Motion to Enforce the Court's Order is **GRANTED.** The Secretary is **ORDERED** not to make any additional adjustments to North Carolina's summer flounder quota in 2001 or any year thereafter on the basis of any additional overages that are discovered from North Carolina's 2000 summer flounder quota. The Secretary is further **ORDERED** to pay the Plaintiffs' reasonable attorneys' fees incurred in connection with the instant motion.

The Clerk is **DIRECTED** to mail a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**